SUTPHEN v. UNITED STATES TRUST CO. OF NEW YORK.

(Supreme Court, Appellate Division, First Department. February 10, 1911.)

1. BROKERS (§ 86*)—COMMISSIONS.

In an action by broker for commissions, *held*, plaintiff was not entitled to recover.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 116–120; Dec. Dig. § 86.*]

2. BROKERS (§ 44*)—COMMISSIONS.

The employment by an owner of real property of a broker to procure a purchaser or lessee does not forever after prevent the owner from selling or leasing the property without being responsible to the broker for commissions.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 45; Dec. Dig. § 44.*]

3. BROKERS (§ 54*)—COMMISSIONS.

A broker's right to commissions depends entirely upon his ability to procure a customer who is willing to purchase or lease the property on the terms proposed by the owner.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 75–81; Dec. Dig. § 54.*]

Scott, J., dissenting.

Appeal from Trial Term, New York County.

Action by Francis M. Sutphen against the United States Trust Company of New York. From a judgment for plaintiff, defendant appeals. Reversed, and new trial ordered.

Argued before INGRAHAM, P. J., McLAUGHLIN, LAUGHLIN, SCOTT, and DOWLING, JJ.

Robert Thorne, for appellant.
William H. Hamilton, for respondent.

INGRAHAM, P. J. This action was brought by a real estate broker to recover commissions for procuring a tenant for a building which was in the possession of the defendant as trustee under the last will and testament of Joseph Fisher, deceased. Messrs. Stewart & Shearer, counselors at law, were the attorneys for defendant as trustees, and were charged with the duty of procuring a tenant or lessee for the premises known as the Hotel Normandie in the city of New York. One Stockton was a clerk in the office of these attorneys, and the plaintiff seems to have obtained his introduction to the office through him. In August, 1907, the plaintiff had a conversation with Stockton about the lease of the Hotel Normandie, and he subsequently conversed with Stockton in relation to the matter in the presence of one of the defendant's attorneys. About January 15, 1908, the plaintiff testified that Stockton sent for him, said that a Mr. Corn, who was under a contract to take a 21-year lease of the Normandie, was trying to get out of it, and wanted to know if plaintiff could not find another tenant on a 21-year lease at $35,000 a year net. Subsequently plaintiff consulted with an associate, and then with this associate went to the office of one Wronkow, and had

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

an interview with him. After an interview with Wronkow, plaintiff on the 22d or 23d of January, 1908, had an interview with Mr. Stewart, one of the defendant's attorneys. At that interview Wronkow offered $33,000 a year net for a 21-year lease which Mr. Stewart said would not be considered. Wronkow then took a permit to visit the premises, and subsequently sent a letter dated January 30, 1908, refusing to pay $35,000 a year, but offering to pay $34,000 a year, rent to commence on the 1st of the following July. Plaintiff afterwards saw Stockton, who told him that the defendant would not accept that proposition, that Corn had stated he was ready to execute a lease on the original terms, and the offer of $34,000 was finally rejected. Plaintiff then had another interview with Stockton over the telephone, stating that, if they could get Wronkow to agree to pay $35,000 a year, the transaction could be closed. Plaintiff went to Wronkow, told him that the $34,000 offer was rejected, and that the best he could do was $35,000 a year. Wronkow then asked what were the taxes, which plaintiff after seeing Stockton stated were about $8,000. At this time Stockton gave to the plaintiff a letter, signing the name of the attorneys to it, stating that the plaintiff was the broker who brought about the lease, and was to receive 1 per cent. of the gross rentals as his commission upon the signing of the contract. It subsequently appeared in evidence that at this time plaintiff agreed to divide his commissions with Stockton. Plaintiff said he had a written agreement to that effect with Stockton, but had lost it, and that he was to pay Stockton out of his commission at least $750 or $1,000. None of this was communicated to the defendant or its attorneys. Plaintiff testified that he subsequently showed this letter to Mr. Shearer, one of the defendant's attorneys, who at once repudiated it, and on the same day, January 28, 1908, prepared a letter, a copy of which is annexed to the complaint, and upon which plaintiff bases his cause of action. That letter provided that:

"If Mr. Wronkow signs a lease of that property, the owner will pay you at least one half of one per cent. upon the gross rental called for by such lease, and in the event that the owner is not obliged to pay any commissions upon the lease which was recently under negotiation with Henry Corn, you are to receive the full one per cent. commission. * * * It is understood that no commission is to be paid, unless a final lease made with the authority of the Supreme Court is actually signed by Herman Wronkow."

Subsequently, and on February 1st, Wronkow wrote a letter to Mr. Stewart, saying that he had concluded to accede to the proposed terms of $35,000 per annum, and the other conditions as stated in his former letter, with a provision that the taxes for the year 1907 should be adjusted. Defendant's attorneys subsequently prepared a form of agreement for a lease as the consent of the Supreme Court had to be obtained before a formal lease could be executed. Wronkow objected to some of the provisions of this contract, and, after some negotiation about it, Wronkow and his attorney called at Stewart's office on or about February 10th or 12th. Before signing the contract, Wronkow asked about the taxes on the property, and, when he was informed that they were between $11,000 and $12,000 per year, he refused to have anything more to do with it, and no con-

tract was signed. Plaintiff subsequently saw Wronkow, but he refused to have anything more to do with plaintiff, and to renew the negotiations, and nothing further was done at that time. So far as appears, that was the end of plaintiff's connection with the transaction. In April plaintiff endeavored to get another tenant, and submitted a proposition to the defendant on other terms than that proposed, but none of these subsequent offers were considered.

Thus by February 10th the negotiations were finished. Wronkow had absolutely refused to sign a lease or an agreement for a lease; and plaintiff's negotiations had fallen through. After the middle of February, plaintiff did not see Wronkow until May, and then apparently about other property. Each time that plaintiff saw Wronkow afterwards Wronkow refused to discuss in any way the Normandie proposition. The Stockton who has been spoken of was a mere clerk in the defendant's attorney's office, and had no authority to sign letters or make any agreements for them.

Wronkow was called as a witness, and stated that he had submitted an offer of $35,000 for the property based upon plaintiff's statement that the taxes were between $7,000 and $8,000; that, as soon as he found that they were between $11,000 and $12,000, he repudiated the transaction, and refused to sign any contract or lease; that this was in the early part of February; that after he refused to take the property plaintiff came to see him again, when Wronkow said to plaintiff, "You misrepresented the taxes to me, and I surely don't want nothing more to do with you," and Wronkow after that refused to negotiate with the plaintiff or have anything more to do with him; that subsequently, in June, 1908, a representative of the firm of Ely & Co. came to see him, and new negotiations for the lease of the building were started. They discussed the offer of $35,000, and its rejection by Wronkow, when the Ely representative said that he could get a more favorable lease for him, when Wronkow said: "Well, see what you can do." This negotiation continued all through June, and several propositions were made between the parties. The Ely representative conducted all the negotiations, did all the work, and finally, on June 24th, Wronkow wrote a letter stating that plaintiff had not represented him in any way in reaching the present agreement, and that before the present negotiations were commenced Wronkow notified plaintiff that he refused to allow him to represent him in any way in the matter. On that day, June 24th, Wronkow signed an agreement for a lease. The defendant then instituted proceedings to get the approval of the Supreme Court, which resulted in an order dated August 6, 1908, authorizing the trustee to execute this lease to Wronkow, and on the 7th day of August in that year the lease was duly executed. That lease was for 21 years at an annual rental of $33,000 for the first 10 years, and $35,000 for the balance of the term, with a provision for a renewal for a further term of 21 years, the rent for the extended term to be based upon 4½ per cent. of the appraised valuation of the demised premises.

Roberts, the representative of Ely & Co., who finally negotiated this lease, had been known to Wronkow for years, and had been

employed by him in various real estate negotiations. This building had been in the market for lease for over two years, and was known to Wronkow long before the plaintiff called his attention to it. For months before plaintiff came to Wronkow about this property he had been negotiating for it through other brokers. Wronkow had made a definite proposition to Corn to take the property from him if he secured a lease of it from the defendant. It further appeared that this property had been in the hands of Ely & Co. for some time, and that they had endeavored to get a lessee, that no one in Ely's office had any knowledge of the plaintiff's connection with this lease, and the defendant paid Ely & Co. the commission for conducting the negotiations and obtaining the lease.

The facts established are that the plaintiff without a request from the defendant or its authorized representatives produced Wronkow as a proposed tenant, and negotiations were commenced and continued which finally resulted in Wronkow proposing to give $35,000 per year. When, however, they came to sign the contract, Wronkow repudiated the agreement as based upon a misrepresentation of the plaintiff as to the amount of the taxes, and all negotiations were then and there terminated. When it was supposed that the negotiations conducted by the plaintiff with Wronkow had been successful and that Wronkow would make a lease, the letter of January 28th was written, which provided for the commission that plaintiff was to receive. This letter clearly had relation to the existing negotiations, and the agreement to pay commissions depended upon Wronkow carrying out the agreement that he had made to sign the lease. He, however, absolutely refused to sign the lease which was then the subject of discussion between the plaintiff, the defendant's attorneys and Wronkow. Wronkow's absolute repudiation of the whole transaction, his refusal to continue the negotiations, and his refusal to have anything further to do with the plaintiff in relation to the lease, entirely ended the plaintiff's connection with the transaction, and the condition was then exactly the same as it was when plaintiff commenced his efforts to obtain a tenant. Wronkow, of course, knew that the property was for rent, but he knew that before plaintiff commenced his negotiations. There is not even a suspicion of bad faith on behalf of the defendant or its attorneys, and the reason why the negotiations finally fell through was not in any way the fault of the defendant or its attorneys. The offer of $35,000 per year was based on the fact that the taxes were $8,000 per year, but, when he ascertained that the taxes were $11,000, he refused to lease the property at that price, and never did lease it at that price. Plaintiff had obtained the information as to the taxes from Stockton, with whom he had made an agreement to divide his commission, but, if plaintiff had stated the correct amount of the taxes, it is evident that Wronkow would not have made the offer of $35,000 per year which was necessary before plaintiff could have been entitled to commissions. Plaintiff had failed in his effort to procure a tenant, and he also failed in his efforts to induce Wronkow to subsequently take up negotiations for a new lease. Certainly the employment by an owner of real prop-

erty of a broker to procure a purchaser or lessee of the property does not forever after prevent the owner from selling or leasing the property without being responsible to the broker for commissions.

The duty that a broker undertakes in procuring a purchaser or lessee for real property and which he must successfully carry out before being entitled to commissions is well settled. His right to commission depends entirely upon his ability to procure a customer willing to purchase or lease the property on the terms proposed by the owner. For unsuccessful efforts he cannot recover compensation, and this evidence is undisputed that his efforts to procure a tenant were unsuccessful. Wronkow's refusal to have any further relations with the plaintiff was not the fault of nor was it instigated by the defendant. It had no interest as to the broker who procured a tenant. What it was interested in was the leasing of the property, and, as before stated, there is not even a suspicion that the defendant or its attorneys were actuated by any bad faith. The defendant was a trustee whose sole duty it was to lease the property to the best advantage for the benefit of those interested in the trust. The trust estate could not possibly be liable for services rendered to the trustee which were of no benefit to the estate, and the evidence is undisputed that the plaintiff's efforts were entirely valueless. There would have been more justice in the plaintiff's claim if he had first called the attention of the proposed tenant to the property so that the final arrangement that was made could be attributed in some way to his efforts. But, as before stated, it is undisputed that Wronkow had known of this property and had been negotiating to obtain a lease of it long before the plaintiff called his attention to it. After Wronkow had refused to continue the negotiations instituted by the plaintiff, and had refused to have anything further to do with him in relation to the transaction, the defendant did not itself enter into negotiations with Wronkow. The new negotiations that were started were brought about entirely by the independent action of Roberts, who was an employé of or interested in the firm of Ely & Co. Ely & Co. had had this property in their hands before the plaintiff had produced Wronkow, and they continued in their efforts to find a lessee after Wronkow had withdrawn and terminated the negotiations. Months after that withdrawal Wronkow was induced by Roberts to again take up the negotiations, plaintiff having ceased all efforts to obtain a tenant. Wronkow distinctly stated to the defendant that he had ended his negotiations with the plaintiff, and would have nothing further to do with him in the transaction. What then was the defendant to do? Must it refuse to negotiate with Wronkow and reject his offer, or be liable to the plaintiff for the commission, and thus either impose upon the estate a claim for upwards of $7,000 for commission to the plaintiff or lose for the benefit of the estate a desirable tenant? Its duty to those interested in the estate was to procure a tenant. That could be procured only by accepting the services of any broker who would actually procure a tenant, and it was its clear duty to take advantage of an opportunity to get a tenant for the benefit of the estate of which it was trustee. It seems to me perfectly clear that by accepting Wronkow when he was again presented

as a tenant by different brokers who had successfully conducted negotiations for a lease which the plaintiff had failed to successfully negotiate imposed no liability upon the trustee to the plaintiff for his unsuccessful efforts.

We think, therefore, that the plaintiff had not successfully accomplished what he undertook to accomplish and upon the accomplishment of which his right to a commission depended, that the promise of the defendant's attorneys to pay him a commission depended upon his performing the service which he had undertaken to perform, and that upon the undisputed facts plaintiff had no cause of action.

It follows, therefore, that the judgment and order appealed from must be reversed and new trial ordered, with costs to the appellant to abide the event.

McLAUGHLIN, LAUGHLIN, and DOWLING, JJ., concur.
SCOTT, J., dissents.